UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>             Plaintiff,<br><br>    v.<br><br>TROY GREEN (2),<br><br>             Defendant. | NO. CR-09-6062-EFS-2<br><br>**ORDER DENYING DEFENDANT GREEN'S MOTION TO DISMISS FOR OUTRAGEOUS GOVERNMENT CONDUCT** |

A pretrial conference occurred in the above-captioned matter on June 28, 2010. Defendant Troy Green was present, represented by Kailey Moran. Assistant United States Attorney Bud Ellis appeared on the United States' Attorney's Office's (USAO) behalf. Before the Court was Defendant Green's Motion to Dismiss for Outrageous Government Conduct[1] (Ct. Rec. 92), which asked the Court to dismiss the Indictment because, without law enforcement's continued and persistent contacts, Defendant Green would not have engaged in the arranged marijuana buy. The USAO opposes the motion, submitting law enforcement's conduct was lawful. After reviewing the submitted material and relevant authority, hearing oral argument, and

---

[1] The Court previously granted Defendant's request to hold an evidentiary hearing on the motion. (Ct. Rec. 143.)

ORDER ~ 1

taking testimony, the Court was fully informed. This Order supplements and memorializes the Court's oral denial of Defendant's motion.

**A.   Background**[2]

In June 2009, Detective Josh Bunton of the Tri-Cities Metro Drug Task Force in Pasco was contacted by an individual (hereinafter, "the confidential informant"), who shared that he had been contacted by Defendants Symons and Still about becoming a source of marijuana for them and Defendant Symons' brother, Defendant Green, who lived in Spokane. The CI relayed that he had been befriended by Defendants Symons, while he was housed in the Franklin County Jail where Defendant Symons worked. The confidential informant also became acquainted with Defendant Symons' boyfriend, Defendant Still, who was also employed as a Franklin County Corrections' officer.

Detective Bunton inquired with Officer Matthew Smith, who was located in Spokane, whether he had any information about Defendant Green. Officer Smith relayed that it was believed that Defendant Green previously received marijuana from a drug trafficking organization operating in Spokane that involved mostly Vietnamese Americans, the majority of whom were arrested on federal and state drug charges in February 2009. Detective Bunton decided to work with the confidential informant; the benefits received by the confidential informant in exchange for his assistance are presently unknown by the Court.

---

[2] This background is based on the filed exhibits, hearing exhibits, and the testimony of Drug Enforcement Administration (DEA) Task Force Officer Matthew Smith and DEA Special Agent Christopher Fay.

ORDER ~ 2

In September 2009, Defendant Still contacted the confidential informant to obtain assistance in purchasing approximately fifty pounds of marijuana. Defendant Still mentioned that he and Defendant Symons were looking for a source of supply so that they could obtain marijuana for themselves to sell and also to provide to Defendant Green because he had lost his source of supply due to the arrest of those involved in the drug trafficking organization that supplied him. Defendant Still advised that he did not have the money to place a large order but wanted to broker the deal for Defendant Green who would front a portion of the order. The confidential informant advised that he could serve as the source of supply.

On September 5, 2009, Detective Bunton arranged for the confidential informant to contact Defendant Still. The confidential informant called Defendant Still and advised that he was in the Tri-Cities. Defendant Still picked up the confidential informant, who was wired with recording equipment, and they drove around so that they could converse. Defendant Still again shared that he was interested in serving as Defendant Green's source of supply. In addition, Defendant Still stated that Defendant Green is "already connected up there" in Spokane. Defendant Still also shared 1) that he and Defendant Green utilize pay phones when they have conversations, 2) the prices Defendant Green previously paid for marijuana with the Vietnamese drug trafficking organization, 3) how much marijuana Defendant Green moves during a month, and 4) that Defendant Green is "not a low-level dealer." The confidential informant and Defendant Still discussed different options for the purchase of the marijuana to be provided by the confidential informant. The confidential informant shared

that he would be willing to meet with Defendant Still in Spokane so that he and Defendant Green could inspect the marijuana.

Thereafter, law enforcement had the confidential informant arrange a meeting between the confidential informant, Defendants Green and Still, and the confidential informant's supplier, who was undercover DEA Special Agent Christopher Fay, who was nicknamed "Hubcap" for the operation, so that the Defendants could view the marijuana. This "flash" occurred on September 19, 2009, in Spokane. The confidential informant and Hubcap were wired and at the location prior to Defendant Still arriving. While waiting for Defendant Green to arrive, Defendant Still asked the confidential informant, out of Hubcap's earshot, whether Hubcap was a "guy we can come back to." The confidential informant responded that Hubcap would give the Defendants cell phones that would be used for contact purposes.

When Defendant Green arrived, Hubcap provided prepaid cellular phones to both Defendants. Defendant Green stated that he "[u]sually has three of them in my pocket." Defendant Green also asked whether the marijuana was indoor or outdoor marijuana. The confidential informant then advised that he trusted Hubcap "as I do my own son" but that he has strict rules and that "you got to be able to use just those phones with him." The confidential informant also warned that it might not be Hubcap that contacts them but possibly two other individuals that he trusts. Hubcap stated, "If you're not interested just toss [the phone], if nobody gets a hold of you um can't get a hold of you we will assume you guys aren't in and we'll lose ours too." There was then a discussion about the

ORDER ~ 4

condition of marijuana that had been being recently sold in the Spokane area.

After this meeting, surveillance units followed Defendants Green and Still from the meet location to 4820 N. Bemis Street in Spokane. A Spokane County Assessor records check revealed Mr. Green as the owner of that residence; Defendant Green also listed this address on his multiple vehicle registrations. Defendant Green is the current account holder for the utilities' account for that address.

Over the next two weeks, Officer Smith placed recorded phone calls to both Defendants Green and Still on the provided telephones. On September 21, 2009, Officer Smith called Defendant Green and asked about whether he was still interested in purchasing marijuana and Defendant Green said, "I like to definitely go ahead with that or what ever." They then discussed potential prices at different purchase amounts. Defendant Green said,

> this would be a regular thing, I have um a couple boys I have been working with for last probably 5 years so and its been going good for that, um the reason I have been saying like the 20 you know was the things I have been getting right now are you know cheaper but their not as good, you know. . . . So I was just trying to introduce my people the the higher price but I mean I know if we were to do em for um like that too then it be no problem and a I can get that ball rolling pretty quickly.

On September 25, 2009, Officer Smith again called Defendant Green, advising that he would be in Spokane either Friday or Saturday. Defendant Green indicated that he was still interested in making a purchase. Officer Smith called Defendant Green again on October 1, 2009. It was arranged that another individual working with Officer Smith would contact Defendant Green on Tuesday to arrange a buy location.

ORDER ~ 5

1    On October 13, 2009, the confidential informant initiated two
2 recorded telephone conversations with Defendant Symons.  In the first, the
3 Confidential informant encouraged Defendant Symons to talk to Defendant
4 Green and determine if "they're gonna be ready soon."  In the second call,
5 the confidential informant advised that he heard from "Hubcap"  and he
6 needed to know how much Defendant Green wanted him to bring.

7    Marijuana purchase was arranged for October 22, 2009.  Hubcap and
8 Officer Smith wore body wires during this exchange.  Defendant Green
9 purchased the offered marijuana for $15,000, and then indicated he was
10 interested in another purchase within the next week.  Soon thereafter, the
11 drug buy location was raided, and Defendants Green and Still were
12 arrested.

**B.   Authority and Analysis**

The "outrageous government conduct" argument was developed based on the following dicta in *United States v. Russell*, 411 U.S. 423 (1973):

> While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, the instant case is distinctly not of that breed. . . .  The law enforcement conduct here stops far short of violating that 'fundamental fairness, shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment.

*Id.* at 431 (citations omitted). The Ninth Circuit relied on this language to allow a defendant to raise a due-process-based outrageous government conduct defense in *United States v. Bogart*, 783 F.2d 1428, 1433 (9th Cir. 1986).  To determine whether due process requires dismissal of the indictment, the government's conduct must be "so grossly shocking and so outrageous as to violate the universal sense of justice." *United States*

ORDER ~ 6

*v. Smith*, 924 F.2d 889, 897 (9th Cir. 1991); *United States v. Garza-Juarez*, 992 F.2d 896, 903-04 (9th Cir. 1993). This is an extremely high standard. *Smith*, 924 F.2d at 897. The rationale for permitting an outrageous government conduct defense is:

> Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means- to declare that the government may commit crimes in order to secure the conviction of a private criminal-would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face.

*Bogart*, 783 F.2d at 1436 (quoting *Olmstead v. United States*, 277 U.S. 438, 485 (1928) (Brandeis J., dissenting)). Whether the government engaged in outrageous conduct is a question of law, rather than a question of fact for the jury. *United States v. Sotelo-Murillo*, 887 F.2d 176, 182 (9th Cir. 1989)

This "shocking to the universal sense of justice" standard is met when the government "operate[s], for an extended period of time, an actual and illegal apparatus." *United States v. Lutrell*, 889 F.2d 806, 812 (9th Cir. 1989), *amended by* 923 F.2d 764 (9th Cir. 1991) (en banc). *See also Greene v. United States*, 454 F.2d 783 (9th Cir. 1971); *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978). Outrageous government conduct also occurs when the government's conduct amounted to the "engineering and direction of [a] criminal enterprise from start to finish." *United States v. Barrera-Moreno*, 951 F.2d 1089, 1092 (9th Cir. 1991). Yet, it is not met "when the government merely infiltrates an existing organization, approaches persons it believes to be already engaged in or planning to participate in the conspiracy, or provides valuable and necessary items

ORDER ~ 7

to the venture." *United States v. Williams*, 547 F.3d 1187, 1199 (9th Cir. 2008) (quoting *United States v. Gurolla*, 333 F.3d 944, 950 (9th Cir. 2003) (internal quotation marks and citations omitted)).

The Ninth Circuit has established five factors that, when satisfied, indicate that the government's conduct was acceptable. *Williams*, 547 F.3d at 1199 (citing *United States v. Bonanno*, 852 F.2d 434 (9th Cir. 1988)). The five factors are:

> (1) the defendant was already involved in a continuing series of similar crimes, or the charged criminal enterprise was already in process at the time the government agent became involved; (2) the agent's participation was not necessary to enable the defendants to continue the criminal activity; (3) the agent used artifice and stratagem to ferret out criminal activity; (4) the agent infiltrated a criminal organization; and (5) the agent approached persons already contemplating or engaged in criminal activity.

*Bonanno*, 952 F.2d at 437-38.

Here, law enforcement had information from three sources that Defendant Green was already involved in a drug trafficking. First, law enforcement suspected Defendant Green's involvement in the trafficking of marijuana given the investigation that occurred of the Vietnamese-based marijuana trafficking organization in Spokane that lead to the arrest of individuals in February 2009. Second, the confidential informant informed law enforcement that both Defendants Symons and Still had advised that they were looking for a new source of supply for Defendant Green. Third, during the September 5, 2009 recorded conversation between the confidential informant and Defendant Still, Defendant Still again relayed that Defendant Green sold marijuana and was looking for a new source of supply. Based on these three sources of information, the Court finds the first factor (Defendant Green was already involved in a continuing series

of similar crimes), fourth factor (agents infiltrated a suspected criminal organization), and fifth factor (law enforcement approached persons already contemplating or engaged in criminal activity) are satisfied.

The Court also finds the third factor satisfied. Law enforcement clearly utilized artifice and stratagem to ferret out the Defendants' criminal activity by utilizing a confidential informant and posing as drug dealers.

The second factor is not as clear. Based on the information that law enforcement had, they reasonably suspected that Defendant Green sold marijuana. However, law enforcement was also aware that the Vietnamese-based drug trafficking organization in Spokane was shut down due to the arrest and federal prosecution of these individuals. Nonetheless, it is reasonable for law enforcement to believe that Defendant Green would look for another source of drugs, especially given the confidential informant's information that he was contacted by Defendants Still and Symons to serve as a source of supply for them and Defendant Green.

In summary, after considering all of the factors under the totality of the circumstances, the Court finds law enforcement did not engage in outrageous government conduct. Law enforcement appropriately acted upon information that was received as to Defendant Green's, and the other co-Defendants', involvement in marijuana distribution. The recorded conversations indicate that all Defendants, including Green, were interested in dealing marijuana and finding a new source of supply given the arrest of the individuals who previously supplied Defendant Green. Law enforcement's reverse sting operation, which incorporated using prepaid cellular telephones and storing the marijuana at a storage facility, was

acceptable in order to create an illusion that they were savvy distributors of high-quality Canadian marijuana. There was nothing in the record to establish that Defendant Green was reluctant or coerced into buying marijuana. The decrease in the amount of marijuana purchased than that previously anticipated by Defendants was not the result of outrageous government conduct but rather because 1) Defendants did not have the amount of money needed to purchase the previously talked about quantity and 2) law enforcement only had a certain amount and type of marijuana available to utilize in this sting operation.

**C.   Conclusion**

It does not "shock the universal sense of justice" for law enforcement to target an individual without any reason to suspect he was engaged in illegal conduct, *Garza-Juarez*, 992 F.2d at 904, or supply the contraband in the investigation, *Hampton v. United States*, 425 U.S. 484, 489 (1976). Here, law enforcement supplied marijuana to individuals they reasonably suspected were distributing marijuana; therefore, under the case law, it is clear that law enforcement's conduct did not shock the universal sense of justice. Accordingly, **IT IS HEREBY ORDERED:** Defendant Green's Motion to Dismiss for Outrageous Government Conduct **(Ct. Rec. 92)** is **DENIED**.

**IT IS SO ORDERED.** The District Court Executive is directed to enter this Order and to provide copies to all counsel.

**DATED** this ___8th___ day of July 2010.


                                        S/ Edward F. Shea
                                          EDWARD F. SHEA
                             United States District Judge